**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4954-18

MICHELLE SHELDON,

     Plaintiff-Appellant,

v.

THE COOPER HEALTH
SYSTEM and LARRAINE
RAMOS,

     Defendants-Respondents.

_____

Submitted February 1, 2021 – Decided March 24, 2021

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0350-17.

McOmber McOmber & Luber, PC, attorneys for appellant (R. Armen McOmber and Matthew A. Luber, of counsel and on the briefs).

Brown & Connery, LLP, attorneys for respondents (Christine P. O'Hearn, Joseph G. Antinori, and Andrew S. Brown, on the briefs).

PER CURIAM

Plaintiff Michelle Sheldon appeals from the June 26, 2019 Law Division order granting her former employer, the Cooper Health System (Cooper), and Lorraine Raimo,[1] a director, summary judgment dismissal of her disability discrimination complaint stemming from her August 7, 2015 termination. For the reasons that follow, we affirm.

I.

We glean the following facts from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).

In 2010, Cooper hired plaintiff in its urogynecology department as a clinical practice assistant. Plaintiff's job duties included scheduling and canceling patient appointments, taking vital signs of patients, calling in prescriptions, running urodynamic testing with nurse practitioners, and otherwise assisting the doctors. On October 9, 2013, while employed at Cooper, plaintiff "slipped and fell" in the parking lot of a Wawa and sustained injuries

---

[1] Lorraine Raimo was incorrectly pled as Larraine Ramos.

A-4954-18

to her neck, back, foot, and ankle. Plaintiff did not seek immediate medical care for her injuries and returned to work within days, despite experiencing pain.

When the pain persisted, plaintiff retained an attorney who advised her to seek medical treatment, as a result of which plaintiff was treated by her family doctor as well as other medical professionals, including Dr. Young Lee, a pain management specialist, Dr. Brandon Bird, a chiropractor, and Dr. Jack Bondi, a podiatrist. Plaintiff also underwent several MRIs. Plaintiff's diagnoses included "cervical disc herniation[s]," "lumbar facet syndrome," "disc bulging," "clinical lumbar radiculopathy," "sacroiliitis," "avascular necrosis of bone," "ankle sprain and strain," "closed ankle fracture," and "osteochondritis." She was prescribed medications, physical therapy, a back brace, and an orthopedic boot. At her deposition, plaintiff testified she eventually stopped seeking treatment for the injuries, primarily because she refused to take the prescribed medications, the chiropractic treatment was too painful, and she rejected the surgical option recommended by the podiatrist. She also stopped wearing the back brace because "[i]t hurt."

On April 17, 2014, approximately six months after the slip and fall, plaintiff requested a leave of absence from Cooper via its online platform, asserting that she had a "serious health condition." A supporting prescription

3

form prepared by Dr. Bondi on April 17 indicated that plaintiff would be absent from work pending test results. Cooper granted plaintiff the requested leave from April 18 to September 12, 2014.

On February 5, 2015, after plaintiff returned to work, she filed a personal injury lawsuit against Wawa and another defendant, alleging that she was "severely and permanently injured" as a result of her fall on Wawa's property (the Wawa lawsuit). A few months later, on May 15, 2015, plaintiff submitted another leave of absence request form to Cooper for her "serious health condition." In a medical certification submitted to support her request for leave under the Family and Medical Leave Act (FMLA), N.J.S.A. 34:11B-1 to -16, plaintiff's chiropractor, Dr. Bird, averred that plaintiff was "unable to perform any of . . . her job functions due to [her health] condition,"[2] and that her "condition [would] cause episodic flare-ups periodically preventing [her] from performing . . . her job functions." Dr. Bird estimated that plaintiff's period of incapacity would end on June 20, 2015.

---

[2] Dr. Bird identified the specific job functions plaintiff was unable to perform as "walking, standing, bending, and lifting." In a subsequent request for plaintiff's medical records submitted by a physician for plaintiff's disability insurance carrier, the requesting physician identified some of plaintiff's occupational demands as "[f]requently standing, walking, reaching," and "lift[ing] . . . up to [ten] pounds of force" as well as "[o]ccasionally sitting," and "lift[ing] . . . up to [twenty] pounds of force."

4

At her deposition, plaintiff testified she requested the second leave of absence because when she "bent down to put a chart into [a] file" at work, she "couldn't get back up" and "had to kind of crawl to [her] co-worker[']s chair to get [her]self back up." According to plaintiff, she "finished [the] day out, and then went to the chiropractor . . . crying" because of the pain. Plaintiff acknowledged that instead of being sympathetic, her co-worker, Melissa Butts (Butts), observed plaintiff crawling and said, "'[y]ou're laying that on a little thick,' implying that she . . . felt [p]laintiff was over-exaggerating her injury."

Cooper granted plaintiff the requested leave from May 18 to June 20, 2015, and then extended the leave period, first to July 17, 2015, and then to August 28, 2015, based on plaintiff's submission of sequential prescription notes prepared by Dr. Lee, her pain management doctor, stating that plaintiff was "unable to return to work." In order to receive temporary disability benefits during her second leave of absence,[3] plaintiff certified in a May 23, 2015 claim submission to the Department of Labor and Workforce Development, Division of Temporary Disability Insurance, that she sustained "[two] [h]erniated [b]ulging disc[s]" from a fall that were "giving [her] severe pain in [her] back and legs," and, as a result, she had been unable to work since May 18.

_____

[3] Plaintiff had exhausted her accrued paid time off during her leave of absence.

A-4954-18

While plaintiff was out of work during her second leave period, Cooper began to receive complaints from other employees questioning plaintiff's health status. On June 10, 2015, the following complaint was submitted to Cooper's anonymous ethics complaint hotline:

> [Plaintiff] is abusing the [FMLA]. [Plaintiff] is currently on [another] medical leave that only takes place during the summer months. [Plaintiff] does not see any Cooper physicians, she utilizes outside physicians. Other employees follow her on social media and she posts pictures of her swimming and attending barbeques. [Plaintiff] is supposed to be in a back brace and at these events, she is not wearing the brace. Employees are becoming frustrated with her absence because [plaintiff] is abusing the medical leave. [Plaintiff]'s work is being divided amongst other employees and it is overwhelming.

On June 19, 2015, a second anonymous complaint was submitted to the hotline, stating that plaintiff was "out on FMLA due to a leg issue. . . . [but] there [was] nothing wrong with [her]." The complainant stated that plaintiff "went on vacation," "went bowling," and "uploaded a video of her swimming." The complainant asserted that plaintiff "has gone out on medical leave at approximately the same time" each year for "the same reason each time," but that plaintiff "does not complain about her head, leg, and back until it is time for her to go on leave again." The complainant maintained that plaintiff "will not

A-4954-18

go to a company doctor" because she "knows a company doctor will not find anything wrong with her."

Additionally, on July 8, 2015, Donna Krisanda, Cooper's Human Resources (HR) Manager, received an email from Butts, plaintiff's coworker, complaining that plaintiff's leave, which was "during the same time [in] the summer months" as her prior leaves, was "a slap in the face for the rest of us who come to work every[ ]day." Butts attached several photos purportedly posted by plaintiff to social media, including a photo "which show[ed] [plaintiff] in a swimming pool with small children and another which showed a pool with the caption, . . . 'Summer don't get no better then [sic] this had the pool all to myself today." The photos also depicted plaintiff at a carnival and attending a graduation party.[4]

After receiving the complaints, Cooper retained a private investigation firm, PrimeSource Investigation (PrimeSource), to conduct surveillance of plaintiff and document her activities and physical capabilities. After three days of surveillance, PrimeSource reported observing plaintiff "entering and

---

[4] At her deposition, Butts acknowledged that she had never reviewed plaintiff's medical records and was unaware of her medical diagnosis. Butts also acknowledged that none of the photos depicted plaintiff engaged in any strenuous physical activity.

operating a vehicle, smoking cigarettes, transporting several individuals, and conducting errands" during which she "lift[ed] and carr[ied] several food items, ben[t] at the waist, and plac[ed] them in her vehicle." PrimeSource's report noted that "[n]o braces or other orthopedic devices were observed on or about [plaintiff]'s body."

Based on PrimeSource's report, indicating that plaintiff engaged in a variety of physical activities without any apparent discomfort or difficulty, Cooper determined that plaintiff had fraudulently misrepresented her inability to work in order to obtain a leave of absence. On August 7, 2015, after being instructed by the HR manager and the general counsel to terminate plaintiff, Lorraine Raimo, the director of operations for the medical practice where plaintiff worked, notified plaintiff during an in-person meeting that Cooper was terminating her employment for falsifying her medical leave application.[5] During the meeting, as instructed, Raimo asked plaintiff whether she had discussed with co-workers that she "watch[ed] [her] grandchildren during the summer," and plaintiff responded that she had. Raimo testified she had been

---

[5] At her deposition, Raimo testified she did not personally review any doctor's note directing that plaintiff be placed on medical leave. Raimo stated she "assume[d] [plaintiff] had one" in order for her leave extension request to have been approved. Raimo also acknowledged she had no reason to doubt the validity of the doctor's note.

directed to ask the question to confirm allegations that plaintiff was "tak[ing] leaves every year to take care of her grandchildren."

Raimo later memorialized her conversation with plaintiff in a letter dated August 18, 2015, which stated:

> As a follow up to our conversation on August 7, 2015, this letter serves as confirmation of your termination from employment with Cooper . . . . As indicated when we spoke, your termination is based on fraudulent behavior. Information that we have been provided contradicts that you have a serious condition that makes you unable to perform your job.

On August 16, 2015, about a week after she was verbally terminated, plaintiff filed an application for Social Security Disability Insurance (SSDI) benefits, certifying that she "became unable to work because of [her] disabling condition on May 15, 2015," and she was "still disabled." In the application, plaintiff acknowledged her awareness that "anyone who makes . . . a false statement or representation of material fact in an application or for use in determining a right to payment . . . [of SSDI benefits] commits a crime." Further, she "affirm[ed] that all information . . . [she provided] in connection with th[e] claim [was] true."

In supporting functional assessment reports dated August 21, and October 19, 2015, plaintiff reiterated her physical and functional limitations, stating she

has "a hard time sitting or standing for periods of time" because of "chronic pain." She stated she could "only walk . . . for about [fifteen] minutes before having to sit," and she could not "pay attention" when she was in pain. Additionally, on January 12, 2016, approximately five months after her termination, plaintiff was deposed in the Wawa lawsuit, and testified that she stopped looking for a job because she could not "sit," "stand," or "walk" for "long periods of time because [she was] always in severe pain."

Medical reports submitted in connection with plaintiff's SSDI application underscored plaintiff's physical and functional limitations. In a September 15, 2016 comprehensive psychiatric examination, plaintiff told the examining psychologist that she was unable to "sit or stand for long periods of time without being in excruciating pain" and was unable to work because of "severe pain with [her] back and neck." In a September 16, 2016 report, plaintiff told the examining nurse practitioner that she had "an average pain level of [eight] to [nine]" for her "neck" and "[nine] to [ten]" for her "lower back" "on [a zero to ten] pain scale." According to plaintiff, "[t]he pain [was] worsened by walking, standing, . . . sitting, bending forward, twisting, or . . . lifting a heavy weight." Plaintiff's application for SSDI benefits was approved on November 22, 2016,

10

following a hearing before an administrative law judge. In 2017, plaintiff began receiving SSDI benefits, retroactive to November 2015.

On January 23, 2017, plaintiff filed a three-count complaint against Cooper and Raimo, alleging that defendants wrongfully terminated her employment by unlawfully discriminating and retaliating against her because of her disability, as well as failing to reasonably accommodate her disability, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.

To "establish a prima facie case" of disability discrimination in a termination context, plaintiff was required to offer evidence that "(1) she [was] disabled within the meaning of the LAD; (2) she 'was performing [her] job at a level that met [her] employer's legitimate expectations'; (3) she was discharged; and (4) [her] employer sought someone else to perform the same work after she left." Grande v. St. Clare's Health Sys., 230 N.J. 1, 17-18 (2017) (second and third alteration in original) (quoting Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 382 (1988)). To set forth a prima facie case of retaliatory discharge, plaintiff was required to offer evidence that (1) she engaged in protected activity known to Cooper, (2) she was thereafter subjected to an adverse employment action, and (3) there was a causal link between the two.

Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990).

Once a prima facie case of either discrimination or retaliation has been established, Cooper's "burden varies depending on whether [it] seeks to establish the reasonableness of the otherwise discriminatory act or advances a non-discriminatory reason for [plaintiff's] discharge." Jansen, 110 N.J. at 382. In the latter case, the burden of going forward shifts to Cooper to articulate some legitimate non-discriminatory or non-retaliatory reason for the adverse action and, if such a reason has been set forth, then plaintiff must demonstrate by a preponderance of the evidence that a discriminatory intent motivated the employer's action. Ibid.; Jamison, 242 N.J. Super. at 445. This can be done by proving that the articulated reason is a pretext for the discrimination or retaliation or that a discriminatory reason was more likely Cooper's motivation. Jamison, 242 N.J. Super. at 445; Jansen, 110 N.J. at 382-83. If that burden is met, then a presumption of retaliatory intent arises that Cooper can dispel by proof, by a preponderance of the evidence, that it would have taken the adverse action regardless of retaliatory intent. Jamison, 242 N.J. Super. at 445-46.

To set forth a prima facie case of discriminatory discharge for failure to accommodate her handicapped status under the LAD, plaintiff was required to

present proof that (1) she qualified as an individual with a disability; (2) she was qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations; and (3) Cooper failed to reasonably accommodate her disabilities. Royster v. N.J. State Police, 227 N.J. 482, 500 (2017); Victor v. State, 203 N.J. 383, 410 (2010).

Making a reasonable accommodation for a disabled employee requires an "interactive process" in which "both [the] employer and employee bear responsibility for communicating with one another to 'identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations.'" Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 422 (App. Div. 2001) (quoting Smith v. Midland Brake, 180 F.3d 1154, 1171 (10th Cir. 1999)). In order to show that Cooper failed to participate in the interactive process, plaintiff was required to demonstrate that Cooper knew of her disability, that plaintiff requested accommodation or assistance, that Cooper did not make a good faith effort to assist her in seeking accommodation, and that plaintiff could have been reasonably accommodated but for Cooper's lack of good faith. Id. at 423 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 315-16, 319-20 (3d Cir. 1999)).

13

During her November 20, 2018 deposition in this case, plaintiff testified she had not worked since her termination from Cooper, and she had no plans of applying for employment in the future because of her medical condition. She testified that although she had accepted a position as a waitress sometime in 2017, she quit after about "a day or two" because "[i]t was too hard on [her] back." Following the close of discovery, over plaintiff's objection, defendants moved for summary judgment on all three counts of the complaint, arguing that plaintiff failed to establish a prima facie case of disability discrimination, retaliation, or failure to accommodate because the discovery revealed that plaintiff would not have been able to perform the essential functions of her job had she returned from medical leave.

On June 7, 2019, during oral argument, the motion judge pointedly questioned plaintiff's counsel on how plaintiff could demonstrate that she was able to perform the job in order to establish a prima facie discrimination claim in light of plaintiff's admissions in the Wawa lawsuit and the SSDI case that she could not work. Counsel responded that although plaintiff sustained "permanent injuries" from "the Wawa fall," she was not "permanently disabled[,] . . . never said that she could [not] work," and, in fact, "worked after [the fall]." Counsel added that none of plaintiff's doctors stated she was permanently disabled, and

plaintiff was not "declared to be permanently disabled until two years [later]." Counsel also pointed out that, contrary to its newly minted assertion, Cooper did not fire plaintiff because she was unable to perform the job, but because Cooper was "frustrated [that] she was out on leave." Counsel asserted the determination on plaintiff's SSDI application was therefore immaterial as to whether she could work at the time of her termination or upon her scheduled return from leave.

The judge then turned his inquiry to defense counsel, who responded that plaintiff was "confusing and conflating two separate issues" because "[w]e don't get to the issue of why Cooper fired her if she [cannot] show she can[] work." Defense counsel stressed that plaintiff "has for the last . . . four years consistently said over and over and over again, in three different legal forums, I can't work, I can't work, I can't work, I can't work." Counsel also pointed out that plaintiff produced "no expert report" indicating that "[she] was able to work" in "August 2015," when she was terminated. Counsel added that because plaintiff could not establish a prime facie case, even if "it . . . matter[ed] why Cooper fired her," Cooper had a "legitimate nondiscriminatory reason" for her termination in that Cooper "honestly believe[d] she fraudulently requested leave."

A-4954-18

Following oral argument, the judge entered an order on June 26, 2019, granting defendants' motion and dismissing plaintiff's complaint with prejudice. In an oral decision placed on the record on June 27, 2019, the judge first recited the facts at length, viewing the facts in the light most favorable to plaintiff and noting that the "detail [was] important because the allegation of discrimination require[d] that [plaintiff] be able to do the job." However, "finding . . . no genuine issues of material fact," the judge pointed out that the "substantial information and admissions [by plaintiff], both in depositions in the Wawa matter and the Social Security applications, that she was unable to work in any capacity" was fatal to her claims.

Specifically, regarding the discrimination claim, the judge determined:

> Plaintiff failed to . . . establish a prima fac[i]e case. She does establish that she was employed. She establishes that there was adverse action in her termination. . . .
>
> She worked for Cooper, had an accident in the Wawa parking lot in . . . 2013, sustained substantial injuries, as alleged in the . . . discovery, . . . particularly to her back, and she was unable to work, had significant functional limitations as . . . described in the discovery and particularly . . . the Social Security . . . application and the Wawa lawsuit.
>
> So this [c]ourt finds that the criteria to be considered in establishing a prima face case has not been met in this particular instance.

16

Regarding her failure to accommodate claim, the judge determined plaintiff failed to establish that "[h]er employer . . . did not make a good-faith effort to assist, and [that] she could have been reasonably accommodated." The judge explained "that the multiple approvals of . . . leaves of absence establishe[d] a good-faith effort to assist," and plaintiff "could not have been [reasonably accommodated] based on her own admissions as to her significant physical disabilities." While the judge acknowledged that plaintiff disputed defendants' good faith effort based on defendants terminating her for purportedly "misrepresenting the level of disability that she had," as to her ability to perform the essential job functions, "there[ was] no question . . . about the fact that she [could not] work, and she could not be accommodated."

In that regard, the judge explained that

> shortly after her termination, [plaintiff] very certainly expressed that she could not be employed. She worked as a waitress for a day, . . . left and couldn't otherwise do the job. She stopped looking for work. She has no intention of returning to work, and this would apparently be based on injuries she sustained in the . . . Wawa accident.

Finally, regarding plaintiff's claim that defendants retaliated against her by terminating her employment when she requested a leave of absence as a reasonable accommodation for her disability, the judge recited that "New Jersey

17

courts have imported the [McDonnell Douglas[6]] burden-shifting standard" requiring that after

> plaintiff establishes a prima fac[i]e case, then the burden shifts for the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. If the defendant meets this light burden, the plaintiff . . . must discredit the defendant's proffered reason for its action or adduce evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Given the fact that defendants "terminated [plaintiff] on the belief that she was . . . misrepresenting the [status] of her disability," in rejecting her retaliation claim, the judge implicitly concluded plaintiff failed to meet her burden. This appeal followed.

## II.

On appeal, plaintiff primarily argues that, given the "material questions of fact and credibility," the judge "committed reversible error when [he] usurped the role of the jury [by] . . . weigh[ing] the evidence and speculat[ing] how a jury might view the material facts and credibility of the parties." Plaintiff asserts that although she is now deemed permanently disabled, there are disputed material facts as to whether she was permanently disabled when she was

---

[6] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

terminated and the judge erred in relying "exclusively on post-termination evidence pertaining to the severity of [her] disability, including that [plaintiff] applied for and received social security disability nearly two years after her termination." Additionally, according to plaintiff, there are disputed material facts as to whether defendants' proffered reason for terminating her was pretextual. Further, plaintiff asserts she "can easily demonstrate a prima facie showing to the jury that the only reason for her termination was her request for an extension of her medical leave," thus establishing that defendant retaliated against her for making the request and failed to engage in the interactive process or afford her a reasonable accommodation by granting her the extended medical leave.

We review a grant of summary judgment applying the same standard used by the trial court. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.

A-4954-18

[Ibid. (citations omitted) (quoting R. 4:46-2(c)).]

At the summary judgment stage, it is "not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact exist[s]." Gilhooley v. Cnty. of Union, 164 N.J. 533, 545 (2000) (citing Brill, 142 N.J. at 540). However, "[i]f there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Brill, 142 N.J. at 540. Further, if "the evidence is utterly one-sided," a trial court has the authority to "decide that a party should prevail as a matter of law." Gilhooley, 154 N.J. at 455 (citing Brill, 142 N.J. at 540). Whereas our review of the facts must comply with Brill's standards, our review of the law is plenary. Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

"The practical effect of [Rule 4:46-2(c)] is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). In that regard, turning to the substantive principles of law pertinent to this appeal, "unlawful discrimination" occurs under the LAD if an employer discharges an individual from employment "because of . . . disability."

20

N.J.S.A. 10:5-12(a).  Specifically, the LAD "prohibit[s] any unlawful discrimination against any person because such person is or has been at any time disabled . . . , unless the nature and extent of the disability reasonably precludes the performance of the particular employment."  N.J.S.A. 10:5-4.1.  In relevant part, the LAD defines disability as a "physical or sensory disability . . . which is caused by bodily injury, . . . or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  N.J.S.A. 10:5-5(q).  As the LAD is social legislation that is remedial in nature, its provisions "should be given liberal construction in order that its beneficent purposes may be accomplished."  Royster, 227 N.J. at 500-01 (quoting Estate of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 584 (2015)).

To address discrimination allegations based on circumstantial evidence under the LAD, the New Jersey Supreme Court adopted the "burden-shifting procedure" articulated in McDonnell Douglas.  See Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005).  There are three steps to the McDonnell Douglas procedure: (1) "the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination;" (2) "the defendant then must show a legitimate nondiscriminatory reason for its decision;" and (3) "the plaintiff must then be given the opportunity to show that [the] defendant's stated

21

reason was merely a pretext or discriminatory in its application." Henry v. N.J.

Dep't of Human Servs., 204 N.J. 320, 331 (2010) (quoting Dixon v. Rutgers,

The State Univ. of N.J., 110 N.J. 432, 442 (1988)).

Turning to the first step of the McDonnell Douglas procedure, it is a "well-settled [principle] that a plaintiff bears the burden to establish a prima facie case showing he or she was a victim of discrimination by an employer." Schiavo v.

Marina Dist. Dev. Co., LLC, 442 N.J. Super. 346, 367 (App. Div. 2015) (quoting

Victor, 203 N.J. at 408). Importantly, "[i]dentifying the elements of the prima facie case that are unique to the particular discrimination claim [under the LAD] is critical to its evaluation." Id. at 368 (quoting Victor, 203 N.J. at 410).

Establishing a prima facie case for "disability or perceived disability discrimination" under the LAD as alleged here requires a plaintiff to show:

> (1) a disability or the employer's perception that the employee was disabled; (2) the employee remains qualified to perform the essential functions of the job and was performing at a level that met the employer's expectations; (3) an adverse employment action because of the disability or perceived disability; and (4) the employer thereafter sought a similarly qualified individual.
>
> [Wild v. Carriage Funeral Holdings, Inc., 458 N.J. Super. 416, 429 (App. Div. 2019), aff'd, 241 N.J. 285 (2020) (citing Grande, 230 N.J. at 17-18; Victor, 203 N.J. at 410-13).]

A-4954-18

At issue here is the second prong. "The second prong—whether the employee is able to perform at a level that meets 'legitimate or reasonable expectations'—is to be evaluated by an objective standard." Grande, 230 N.J. at 18 (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 21 (2002)). Under this standard, "[a]ll that is necessary is that the plaintiff produce evidence showing that [he or] she was actually performing the job prior to termination." Ibid. (first alteration in original) (quoting Zive, 182 N.J. at 454); see also Victor, 203 N.J. at 410 ("The second element requires [a] plaintiff to demonstrate that he or she is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation."). Whether or not an employee's performance was deficient is immaterial under this objective standard and is "reserved for consideration at later stages in the analysis." Grande, 230 N.J. at 18 (citing Viscik, 173 N.J. at 21).

Should a prima facie case be established, the plaintiff is entitled to "a presumption . . . that the employer unlawfully discriminated against [him or her]." Ibid. (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596 (1988)). At this point in the McDonnell Douglas procedure, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action." Hejda v. Bell Container Corp., 450 N.J. Super. 173, 193

23

(App. Div. 2017) (quoting <u>Zive</u>, 182 N.J. at 449).  If such a reason is produced in the second step of the <u>McDonnell Douglas</u> procedure, the plaintiff "may respond with proof that the employer's proffered reason 'was not the true reason for the employment decision but was merely a pretext for discrimination.'" <u>Wild</u>, 458 N.J. Super. at 430 (quoting <u>Grande</u>, 230 N.J. at 19); <u>see also</u> <u>Hejda</u>, 450 N.J. Super. 193-94 ("Once that reason is articulated, it is left to the employee to prove by a preponderance of the evidence that the reason was merely pretextual.").

When proving pretext in the third step of the <u>McDonnell Douglas</u> procedure, "a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." <u>Zive</u>, 182 N.J. at 449 (citing <u>Viscik</u>, 173 N.J. at 14).  Significantly, this "burden merges with the plaintiff's ultimate burden of persuading the court that she or he was subjected to intentional discrimination."  <u>Ibid.</u>  Further, under the LAD, "[t]he burden of proving that the employer intentionally discriminated remains at all time with the employee."  <u>Wild</u>, 458 N.J. Super. at 430 (citing <u>Grande</u>, 230 N.J. at 19).  Additionally, "courts have recognized that the prima facie case is to be evaluated solely on the basis of the evidence presented by the

24

plaintiff, irrespective of [a] defendant['s] efforts to dispute that evidence." Zive, 182 N.J. at 448.

Here, we agree with the judge that there is no genuine dispute of material fact that plaintiff was unable to perform the essential functions of her job as a clinical practice assistant at the time of her termination on August 7, 2015, and, in fact, was not performing the job prior to termination to satisfy the second prong of her prima facie case. To satisfy the second prong, plaintiff must identify objective evidence establishing she was able to perform the duties of her job at the time of her termination. However, plaintiff's medical evidence that she was "unable to return to work" until August 28, 2015, established the direct opposite. Further, by her own admission in her August 16, 2015 application for SSDI benefits, plaintiff certified that as of May 15, 2015, she was unable to work because of her disabling condition and was still disabled.

The deficiency in plaintiff's proofs is further underscored by the fact that during her November 20, 2018 deposition in this case, plaintiff testified, as she had in her January 12, 2016 Wawa lawsuit deposition, that she had no plans to apply for any jobs because of her medical condition. Thus, based on her sworn testimony and certifications, plaintiff was unable to demonstrate under the second prong that she was qualified to perform the essential functions of the job

A-4954-18

to establish a prima facie case for disability discrimination under the LAD. The fact that plaintiff did not file her application for SSDI benefits until after her termination and did not receive SSDI benefits until approximately two years later does not alter that determination because the prima facie case is evaluated solely on the basis of plaintiff's evidence. Likewise, defendants' belief that plaintiff was misrepresenting her health status at the time defendants terminated her is not material to the analysis of plaintiff's prima facie case.

Turning to plaintiff's retaliation claim, "[t]he LAD declares that it is an unlawful employment practice 'to take reprisals against any person because that person has opposed any practices or acts forbidden under this Act.'" Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 125 (2008) (quoting N.J.S.A. 10:5-12(d)). To establish a prima facie case for a retaliation claim under the LAD, a plaintiff must "demonstrate that: (1) [he or she] engaged in a protected activity known by the employer; (2) thereafter [his or her] employer unlawfully retaliated against them; and (3) [the] participation in the protected activity caused the retaliation." Ibid. (quoting Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995)); see also Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013).

A-4954-18

In addition, "as a prerequisite for proceeding on a retaliatory [action] claim, a plaintiff must also bear the burden of proving that he or she had a good faith, reasonable basis" for engaging in the protected activity. See Tartaglia, 197 N.J. at 125 (citing Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 373 (2007)); see Melick v. Twp. of Oxford, 294 N.J. Super. 386, 397 (App. Div. 1996) (acknowledging that the trial court properly concluded that protected activity included the plaintiffs' complaints to their employer about disability discrimination). Should a plaintiff sufficiently state "a prima facie case, the burden of production . . . shifts to [the] defendant to articulate a legitimate reason for that decision." Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996). If so articulated, the "[p]laintiff must then show that a retaliatory intent, not the proffered reason, motivated defendant's actions." Ibid.

Here, plaintiff argues that "requesting and taking medical leave is protected conduct" under the LAD and that her "retaliation claim is based upon the undisputed fact that [d]efendants terminated her employment for requesting an extension of her medical leave in accordance with her doctor's instructions." Plaintiff asserts that "there was a clear causal link between the two, as [p]laintiff was terminated while still on medical leave as the result of the . . . 'investigation,'

27

which was only initiated by [d]efendants after [p]laintiff first requested said accommodation."[7]

We agree that plaintiff engaged in a protected activity by requesting medical leave for a "serious health condition."  See Hampton v. Armand Corp., 364 N.J. Super. 194, 200-01 (App. Div. 2003) (finding that New Jersey has a strong public "policy of protecting employees against retaliatory and discriminatory conduct in specific situations," including when an employee "tak[es] sick leave").  However, there are no facts that are "unusually suggestive of retaliatory motive" on the part of defendants related to her termination. Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).  Further, plaintiff failed to produce any credible evidence of "a causal link between the protected activity and the adverse employment consequence."  Victor, 203 N.J. at 409; see Young, 385 N.J. Super. at 467 (holding that "the mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily

---

[7] We reject defendants' contention that plaintiff seeks to improperly amend her pleadings in connection with her retaliation claim and are satisfied that plaintiff's complaint included allegations of retaliation based on her requesting a leave extension.

A-4954-18

be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." (alterations in original) (quoting Krouse, 126 F.3d at 503)).

Even if a causal link existed, defendants articulated a legitimate, nondiscriminatory reason for plaintiff's termination, which plaintiff failed to rebut with competent evidence demonstrating that the reason was false or motivated by retaliatory intent. An employer is entitled to summary judgment if, after proffering a legitimate, nondiscriminatory reason for its decision, the plaintiff cannot "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Zive, 182 N.J. at 455-56.

Defendants' stated reason for terminating plaintiff was its belief that she had engaged in fraudulent conduct by misrepresenting her health condition in requesting FMLA leave. Defendants' belief was informed by its review of co-workers' complaints and PrimeSource's investigative report confirming plaintiff's apparent lack of difficulty or discomfort in performing daily activities. Plaintiff asserts that Raimo's deposition testimony that she did not personally review plaintiff's doctor's note supporting her leave request or have reason to

29

doubt the validity of the note is evidence of pretext. However, plaintiff's assertion is unpersuasive. Notably, at the time of her termination, plaintiff's medical leave request had already been approved based on the doctor's note in question. Thus, the content and validity of plaintiff's doctor's note neither provided a reason to disbelieve defendants' articulated legitimate reasons for termination nor made it more likely than not that an invidious discriminatory reason was the motivating or determinative cause for defendants' action in terminating plaintiff for what it believed was fraudulent behavior in applying for FMLA leave.

While not controlling, guidance from federal courts suggests that "[t]o prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules." Capps v. Mondelez Glob., LLC, 847 F.3d 144, 153 (3d Cir. 2017) (alteration in original) (quoting Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1003 (8th Cir. 2012)). Thus, the "critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he [or she] was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." Ibid. (quoting Pulczinski, 691 F.3d at 1002). Raimo's testimony provided no evidence, either

direct or circumstantial, demonstrating that defendants' stated reason for firing plaintiff was false.

We also find persuasive the reasoning in federal decisions holding that "[w]here an employer provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate, nondiscriminatory justification for the discharge." Capps, 847 F.3d at 152. Indeed, federal courts have held that "[d]iscrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination." Id. at 154 (quoting Medley v. Polk Co., 260 F.3d 1202, 1208 (10th Cir. 2001)). Thus, even if plaintiff could show that the proffered reason was false, she has failed to present any evidence establishing that defendants were motivated by discriminatory intent to meet her burden under the McDonnell Douglas procedure. See Henry, 204 N.J. at 331 (finding that the plaintiff must show that the employer's reason was both false and "motivated by discriminatory intent" (quoting Zive, 182 N.J. at 449)).

Finally, we consider plaintiff's claim that she "demonstrated a prima facie case that [d]efendants failed to provide her a reasonable accommodation and further failed to take any steps to engage in the interactive process, thus resulting

31

in adverse employment action." "Although the term 'reasonable accommodation' is not defined within the text of the LAD," our New Jersey Supreme Court has "declared that '[a]ffording persons with disabilities reasonable accommodation rights is consistent with the LAD's broad remedial purposes.'" Delanoy v. Twp. of Ocean, 462 N.J. Super. 78, 98 (App. Div. 2020) (quoting Victor, 203 N.J. at 412).

In Tynan v. Vicinage 13 of Superior Court of N.J., 351 N.J. Super. 385, 400-01 (App. Div. 2002), we adopted the federal standard for engaging in an informal interactive process to address employee accommodation requests:

> To determine what appropriate accommodation is necessary, the employer must initiate an informal interactive process with the employee. This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability. Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation.

After the disabled employee requests an accommodation from an employer, "both parties have a duty to assist in the search for [an] appropriate reasonable accommodation and to act in good faith." Ibid. (quoting Taylor, 184 F.3d at 312).

32

To demonstrate a prima facie claim for discriminatory discharge for failure to accommodate an employee's disability under the LAD, a plaintiff "must establish these elements: '(1) the plaintiff had a disability; (2) the plaintiff was able to perform the essential functions of the job; (3) the employer was aware of the basic need for an accommodation; and (4) the employer failed to provide a reasonable accommodation.'" Delanoy, 462 N.J. Super. at 99 (quoting Royster, 227 N.J. at 500); see also Richter v. Oakland Bd. of Educ., 459 N.J. Super. 400, 414 (App. Div. 2019) (explaining that "the McDonnell Douglas burden-shifting framework is not useful and unnecessary in the context of a failure to accommodate claim" (footnote and brackets omitted)).

If the employee cannot perform the essential functions of the job because of the disability, "then the court must consider whether reasonable accommodations would enable the person to perform those functions; however, an accommodation is not reasonable if it imposes undue financial and administrative burdens or requires fundamental changes in the nature of the employment." Svarnas v. AT&T Commc'ns., 326 N.J. Super. 59, 75-76 (App. Div. 1999). See N.J.A.C. 13:13-2.5(b) (providing that "[a]n employer must make a reasonable accommodation to the limitations" of a disabled employee,

"unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business").

In the context of LAD disability cases, "courts have construed the notion of 'reasonable accommodation' as entailing an employer's duty to accommodate the 'physical disability' of a disabled employee, and not a 'duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or renumeration.'" Delanoy, 462 N.J. Super. at 99 (quoting Jones, 339 N.J. Super. at 426). See Tynan, 351 N.J. Super. at 397 ("An employer's duty to accommodate . . . . 'does not require acquiescence to the employee's every demand.'" (quoting Vande Zande v. State of Wis. Dep't of Admin., 851 F. Supp. 353, 362 (W.D. Wis. 1994))). For example, the LAD does not require an employer to accommodate an employee with permanent and indefinite light-duty assignments or a part-time work schedule. Delanoy, 462 N.J. Super.at 101; see also Raspa v. Off. of Sheriff of Cnty. of Gloucester, 191 N.J. 323, 336-37 (2007) (finding light duty is required to be offered only if the disability is temporary).

N.J.A.C. 13:13-2.5(b)(1)(ii) expressly includes "leaves of absence" as a reasonable accommodation, and "[s]ome courts have held that leaves of absence and allowance of time-off for medical care or treatment may constitute reasonable accommodations for disability-related absences." Svarnas, 326 N.J.

Super. at 79.  "Nevertheless, an indefinite unpaid leave is not a reasonable accommodation, especially where the employee fails to present evidence of the expected duration of her impairment."  Ibid.  See Rascon v. U.S. West Commc'ns., 143 F.3d 1324, 1334 (10th Cir. 1998) (explaining that reasonable accommodation does not require employer to wait indefinitely for plaintiff's medical condition to be corrected).  "Whether a leave request is reasonable will turn on the facts of each particular case."  Svarnas, 326 N.J. Super. at 79.

Applying these principles here, plaintiff cannot establish a prima facie case of failure to accommodate because plaintiff's own admissions show that at least three months prior to her termination, she was unable to perform the essential functions of the job due to her disabling condition.  Further, prior to her termination, defendants had provided reasonable accommodations to plaintiff by granting her sequential medical leave requests, which were the only accommodations she requested.  See Tynan, 351 N.J. Super. at 400 ("Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation.").

Plaintiff claims that her termination was due to defendants' unwillingness to engage in the interactive process and reasonably accommodate her disability by granting yet another request for continued medical leave.  Putting aside the

A-4954-18

question of whether defendants had an obligation to grant plaintiff another medical leave to accommodate her disability, the fact remains that such an accommodation would have been futile given plaintiff's deposition testimony that she essentially had no plans of working because of her health condition. Thus, plaintiff failed to demonstrate that with a reasonable accommodation, she would have been able to perform her job functions satisfactorily.

Moreover, as previously discussed, there is not one shred of evidence that defendants' conduct was motivated by discriminatory animus. To defeat summary judgment, plaintiff "needed . . . some evidence from which a factfinder could infer that the employer's proffered reason was either a post hoc fabrication or otherwise did not actually motivate the decision." Svarnas, 326 N.J. Super. at 82. "A plaintiff must demonstrate weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason such that a rational factfinder could find the reason unworthy of credence." Ibid. Plaintiff made no such showing here, and we are satisfied the judge correctly granted summary judgment on all claims in defendants' favor.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4954-18